# No. 15-1007

# In the
# United States Court of Appeals
# for the Fourth Circuit

YVONNE PETRIE,

*Plaintiff/Appellant,*

v.

VIRGINIA BOARD OF MEDICINE, et al.,

*Defendants/Appellees.*

APPEAL FROM A DECISION OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

## APPELLANT'S BRIEF AND ADDENDUM

Vincent M. Amberly
AMBERLY LAW
129 Harrison Street N.E.
Leesburg, VA 20176
vinceamberly@yahoo.com

Aaron R. Gott
GOTT PLLC
1660 South Highway 100
Suite 500
St. Louis Park, MN 55416
aaron.gott@mac.com

*Attorneys for Plaintiff-Appellant
Yvonne Petrie, D.C.*

# **TABLE OF CONTENTS**

JURISDICTION ...................................................................... 1

STATEMENT OF THE ISSUES ............................................... 1

STATEMENT OF THE CASE .................................................. 5

   Discovery and Evidentiary Rulings .......................................... 15

STANDARD OF REVIEW ....................................................... 17

SUMMARY OF ARGUMENT ................................................. 18

ARGUMENT ......................................................................... 22

  I.   THE BOARD DID NOT MEET ITS BURDEN OF SHOWING THE ABSENCE OF A GENUINE DISPUTE OF MATERIAL FACT ............................................................... 23

  II.  THE BOARD IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW .............................................................. 28

    A. Quick-Look Review is the Appropriate Test for the Board's Exclusion of an Entire Class of Competitors ................... 29

    B. Dr. Petrie Made a Sufficient Showing of Anticompetitive Effects Under Quick-Look Review and the Full Rule of Reason ..................................................... 36

    C. The Board's Official, Published Action Against Dr. Petrie is Sufficient Evidence of Conspiracy ..................................... 45

    D. Dr. Petrie Made a Sufficient Showing of Antitrust Injury ................................................................................... 49

  III.  THE DISTRICT COURT IMPROPERLY PREVENTED THE DISCOVERY AND PRESENTATION OF EVIDENCE ...... 56

    A. The District Court Improperly Denied Dr. Petrie's Motion to Compel Deposition of Valerie Hoffman ............................ 56

    B. The District Court Improperly Excluded Dr. Petrie's Expert Reports ..................................................................... 59

      a. Dr. Edelberg ................................................................. 60

      b. Dr. Chaney ................................................................... 62

i

c. The Edelberg and Chaney Reports are Highly Relevant
to this case............................................................... 64

C. The District Court Improperly Struck Dr. Petrie's Expert
Declaration................................................................. 67

CONCLUSION ............................................................... 71

STATEMENT OF RELATED CASES ............................................ 72

STATEMENT REGARDING ORAL ARGUMENT....................... 72

ADDENDUM INDEX

# Table of Authorities

**CASES:**                                                               **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)................24

*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 437–51 (1982) 33

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 477-78
    (1977) ......................................................................49

*California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 769-70 (1999)...30, 39

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ........................24, 25

*Charbonnages de France v. Smith*,
    597 F.2d 406, 414 (4th Cir. 1979)......................................25

*Clinical Psychologists v. Blue Shield of Va.*,
    624 F.2d 476, 485 (4th Cir. 1980)......................................31

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
    277 F.3d 499, 508 (4th Cir. 2002)...................... 17, 28, 29, 35-36, 38

*Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977)......38

*Cooper v. Forsyth Cnty. Hosp. Auth., Inc.*,
    789 F.2d 278 (4th Cir. 1986)......................................39, 46

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752, 768 (1984) ..................................................35

*Evans v. Technologies Applications & Serv. Co.*,
    80 F.3d 954, 958 (4th Cir. 1996)......................................17

*FTC v. Superior Court Trial Lawyers Ass'n.*, 493 U.S. 411 (1990)....39

*Garlinger v. Hardee's Food Sys., Inc.*,
    16 F. App'x 232, 235 (4th Cir. 2001) ................................60

iii

*Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788 n.17 (1975)..........31

*Indiana Fed'n of Dentists*, 476 U.S. at 459–60 .............................33, 34

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877, 885 (2007) .........................................................38, 39

*Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*,
    43 F.3d 922, 929 (4th Cir. 1995).......................................................18

*Maryland v. Universal Elections, Inc.*,
    729 F.3d 370, 380 (4th Cir. 2013).....................................................17

*Morrison v. Nissan Co.*, 601 F.2d 139, 147 (4th Cir. 1979) ...............28

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*,
    468 U.S. 85, 113 (1984) ....................................................................44

*Nat'l Soc. of Prof'l Engineers v. United States*,
    435 U.S. 679, 696 (1978) ......................................30, 34, 38, 39, 44, 45

*Neel v. Waldrop*, 639 F.2d 1080 (4th Cir. 1981)..................................48

*N. Carolina State Bd. of Dental Exam'rs v. FTC*,
    717 F.3d 359, 375 (4th Cir. 2013)......................12, 31, 32, 33, 46, 47

*NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134 (1998)....................42

*Oksanen v. Page Mem'l Hosp.*,
    945 F.2d 696, 709 (4th Cir. 1991).........................................35, 39, 46

*Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440 (9th Cir. 1988) ..........39

*Pinhas v. Summit Health, Ltd.*, 500 U.S. 322 (1991) ..................50, 51

*Pulliam Inv. Co. v. Cameo Properties*,
    810 F.2d 1282, 1286 (4th Cir. 1987)..........................24, 25, 28, 49, 71

*Rambus, Inc. v. Infineon Technologies AG*,
  145 F. Supp. 2d 721, 726 (E.D. Va. 2001) .........................................69

*Robertson v. Sea Pines Real Estate Companies, Inc.*,
  679 F.3d 278 (2012).............................................................14, 30, 46

*Safecard Servs., Inc. v. Dow Jones & Co.*,
  537 F.Supp. 1137 (D. Va. 1982), *affirmed without opinion*, 705 F.2d
  445 (4th Cir. 1983), *certiorari denied* 104 S.Ct., 464 U.S. 831, 78
  L.Ed.2d 111 ...................................................................................48

*State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997) .......................................38

*United States v. Francisco*, 35 F.3d 116, 118 (4th Cir. 1994).............18

*United States v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995) ....... 59-60

*United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997) ...............60

*Weiss v. York Hosp.*, 745 F.2d 786, 821 (3d Cir. 1984) .................34, 39

## FEDERAL STATUTES

15 U.S.C. § 1 ...........................................................................10, 31, 62

15 U.S.C. § 4 ............................................................................................9

15 U.S.C. § 15 ..........................................................................................1

15 U.S.C. § 26 ......................................................................................1, 9

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1337(a) .................................................................................1

v

**STATE STATUTES**

Va. Code § 54.1-2900 ................................................................7

**RULES**

Fed. R. Civ. P. 56 ..........................................................17, 24

Fed. R. Evid. 401 ................................................................59

## JURISDICTION

This appeal arises from the district court's grant of summary judgment for the defendants in an action for treble damages and injunctive relief for injuries resulting from defendants' conspiracy to restrain trade in violation of the antitrust laws of the United States. The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. The district court entered its order of judgment December 1, 2014; Appellant's notice of appeal was filed December 31, 2014. (App'x 624). This Court has jurisdiction for this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

**Issue 1**. Summary judgment may be granted under Fed. R. Civ. P. 56 only upon a showing by the moving party that no genuine dispute of material fact remains for trial and that party is entitled to judgment as a matter of law. The Board asserted that Dr. Petrie did not have evidence to support her claims without addressing the allegations of her complaint or pointing to the lack

of evidence in the record. Is a defendant entitled to summary judgment where it asserts—without support—that a plaintiff has no evidence to support her claims and fails to address the material allegations of her complaint?

**Issue 2.** Quick-look review is the appropriate standard of analysis for antitrust conspiracy cases where the anticompetitive effects of a practice are easily ascertainable without plenary market analysis. The Board's decision excludes chiropractors as a class of competitors from the relevant service markets as a matter of law through their authority as a quasi-public regulatory board. Is quick-look review appropriate where the anticompetitive effects of a horizontal group boycott are obvious?

**Issue 3.** Under the full rule of reason, the burden of showing anticompetitive effects is on the plaintiff; the defendant has the burden of showing procompetitive benefits to justify the restraint. After Dr. Petrie made a showing of anticompetitive effects for the exclusion of chiropractors from the relevant service markets, the Board argued that its general authority to regulate the scope of practice of healing-arts practitioners was a "market benefit"

without addressing the particular restraint—the exclusion of chiropractors from the relevant markets—at issue. Is a defendant entitled to judgment as a matter of law where it fails to offer a procompetitive justification of the particular restraint at issue?

**Issue 4.** To prevail on her antitrust claim, a plaintiff must show concerted action by two or more defendants. This Court has held that direct evidence in the form of official, public action by a board or body constitutes sufficient evidence of conspiracy. Does direct evidence in the form of official, published action by a board and indirect evidence negating the possibility of legitimate parallel conduct sufficient to establish concerted action?

**Issue 5.** A plaintiff must show an injury of the type the antitrust laws were meant to protect against to have standing to bring an antitrust claim. Dr. Petrie showed that she was excluded, as representative of a class of service providers, from the relevant service markets. Does a plaintiff's damages resulting from her exclusion from the market as a result of the defendants' horizontal group boycott establish antitrust injury?

**Issue 6.** In a deposition occurring on the day before the close of discovery, a witness for the Board disclosed new, material information about the Board's process for determining whether probable cause of a violation exists that was improperly withheld from disclosure by the Board. Is a plaintiff entitled to depose a key witness regarding newly disclosed information that the defendant failed to produce in discovery?

**Issue 7.** Expert testimony is admissible where it would aid the jury in deciding the issues and where it has a connection to the relevant questions of the case. The district court excluded Dr. Petrie's two experts who would have provided testimony establishing anticompetitive effects and negating the Board's procompetitive justifications. Should Dr. Petrie be denied the opportunity to present relevant expert testimony on the material elements of her claim?

**Issue 8.** The district court excluded the affidavit of Dr. Petrie's expert witness submitted in response to the Board's motion for summary judgment. The expert declared in his affidavit that the Board had grossly mischaracterized his deposition testimony. The

4

court held that no disputed issues of fact remained on issues the Board had used the mischaracterized testimony to argue that no disputed facts remained. Did the district court err in excluding the affidavit, and if so, did the affidavit create a genuinely disputed issue of material fact precluding summary judgment?

## STATEMENT OF THE CASE

Dr. Yvoune Kara Petrie, DC, brought this action seeking relief, under the federal antitrust laws, from the acts of a group of medical and osteopathic doctors[1] in private practice who conspired to limit competition from competing classes of healthcare providers through a boycott cloaked as professional regulation. They accomplished this through the Virginia Board of Medicine, a quasi-public, quasi-private licensing entity that is dominated by allopathic physicians that have unsupervised authority over a competing classes of healthcare providers: doctors of chiropractic.

Virginia doctors of chiropractic threaten the profits and lifestyle of Virginia medical doctors by invading their "turf" in

---

1. Doctors of osteopathy, although sometimes referred to separately, are also included within the definition of medical doctors for the purposes of this brief.

treating patients' conditions and underlying causes thereof, often less expensively and more effectively. Throughout the country, doctors of chiropractic are replacing medical doctors as patients' primary-care providers. They challenge the current structure of healthcare by focusing on overall wellness and underlying causes rather than treating the symptoms of disease. Given that over forty percent of Americans have sought out complementary and alternative healthcare providers, most of whom use a "functional" and/or "integrative" approach to healthcare, that challenge has succeeded. Like many disruptive competitive threats, complementary and alternative medicine ("CAM") providers[2] face fierce resistance through entrenched incumbents who use their influence to keep them at bay.

This is particularly true in the Commonwealth of Virginia, which—unlike the overwhelming majority of states—has a regulatory regime that provides a decisive coalition of allopathic physicians in private practice the unchecked power to oversee the professional licensing and discipline of doctors of chiropractic

---

2. Doctors of chiropractic are one type of CAM provider. Acupuncturists and midwives are examples of other types.

through the Virginia Board of Medicine. These self-interested private market participants have seized upon the opportunity to exclude a competing class of healthcare providers, using Dr. Petrie as a springboard.

Prior to the Board's actions giving rise to this suit, Dr. Petrie served as a primary-care provider employing an integrative and functional approach to healthcare. Like all doctors of chiropractic, her diagnosis and treatment modalities were directed at healthy functioning of the central, peripheral, and autonomic nervous system. (App'x 495–96). A minority of doctors of chiropractic solely assist the nervous system by manipulating the vertebrae of the spine, many times providing temporary relief from nerve and musculoskeletal issues. (App'x 495). Advancements in scientific understanding of human physiology have come far since the introduction of chiropractic spinal manipulation; we now know, as published in peer-reviewed journal articles, that the health of the human nervous system is dramatically affected by lifestyle and nutrition. (App'x 491–95). Nerve function is particularly affected by the intake and delivery of oxygen, vitamins, minerals,

hormones, and glucose in the bloodstream. (App'x 495–96). Consistent with a scope of practice of "assisting nature for the purpose of normalizing the transmission of nerve energy," Va. Code § 54.1-290, Dr. Petrie and a large number of doctors of chiropractic provided functional healthcare: prevention, diagnosis, and treatment of the underlying conditions that wreak havoc on the nervous system through a holistic approach to health: proper diet and nutrition, fitness, and lifestyle. (App'x 196–2-1, 484–490). She did so within the standards of her education and training as well as the standards found in evidence-based, peer-reviewed research.

On February 2, 2012, the Virginia Board of Medicine issued Dr. Petrie a notice of informal conference inquiring into purported allegations that she may have violated certain laws and regulations governing the practice of chiropractic within the Commonwealth. On May 3, 2012, after an informal hearing in April, the Board issued Dr. Petrie a reprimand, imposed a $2500 fine, required that she provide the Board with a written statement verifying compliance with the laws regulating the practice of

medicine and the other healing arts, and ordered that she cease using a benign laser device in her practice. Dkt 118-7. Dr. Petrie requested a formal hearing before the board. The Board convened a formal hearing February 22, 2013 before a panel comprised predominantly of medical doctors (and not a single doctor of chiropractic). The Board issued a February 28, 2013 order suspending Dr. Petrie's license to practice chiropractic for six months, imposing a monetary penalty of $25,000, and conditioning her reinstatement on an agreement to limit her practice so as not to "treat pain." (App'x 437). On appeal, the Virginia courts affirmed the Board's decision as required by Virginia's highly deferential judicial review procedures under the substantial evidence test. Dkt 118-12; 118-13.

Dr. Petrie filed her complaint in this action against the Board in the Eastern District of Virginia seeking relief under Sections 4 and 16 of the Clayton Act against the Board and the financially self-interested panel members for conspiring to restrain trade in

interstate commerce in violation of Section 1 of the Sherman Act.[3] On February 3, 2013, Dr. Petrie filed her First Amended Complaint (App'x 1) which named the following individual defendants: J. Randolph Clements, DPM, a doctor of podiatry (App'x 5 at ¶ 12); Kamlesh Dave, MD, a medical doctor (App'x 5 at ¶ 13); Siobhan Dunnavant, MD, a medical doctor (App'x 5 at ¶ 14); William Harp, MD, a medical doctor and executive director of the Board (App'x 5 at ¶ 15); Jane Piness, MD, a medical doctor (App'x 6 at ¶ 16); and Wayne Reynolds, DO, osteopath (App'x 6 at ¶ 17).[4] The court granted Plaintiff's motion to amend the Complaint on February 4, 2014. Dkt 15.

The Board moved for summary judgment on every element of Dr. Petrie's antitrust claim. (App'x 85). The Board's statement of undisputed facts did not address the material facts of Dr. Petrie's allegations; it simply asserted—without pointing to anything in

---

3. Dr. Petrie alleged and maintains allegations of conduct before, during, and after the formal hearing, including, for example, the Board's interference with Dr. Petrie and other doctors' of chiropractic ability to compete by advising third-party clinical laboratories not to do business with doctors of chiropractic.

4. The Virginia Board of Medicine and the Individual Defendants-Appellees are collectively referred to as "the Board" throughout this brief except where otherwise dictated by context.

the record—that Dr. Petrie "failed to establish the basic elements of an antitrust violation." (App'x 85). It argued, *inter alia*, that (1) Dr. Petrie could not disprove the possibility of parallel conduct, (2) that the Board's conduct had no substantial anticompetitive effects, (3) that any such effects "are not outweighed by the procompetitive benefits," and (4) that Dr. Petrie lacked antitrust standing. (App'x 85–101).

Dr. Petrie submitted significant evidence in opposition. She made a showing of concerted activity through the Board's published, official action against her (App'x 437); statements by the Board's members that they actively participated in the decision; and a statement by Appellee Dr. Harp that acting against Dr. Petrie was an "opportunity to draw a bright line" between the two competing professions. (App'x 472–73 (169:22–170:6)). Dr. Petrie's economic expert report established the board's market power and the anticompetitive effects of its action against Dr. Petrie based on its authority to permit, regulate, and exclude competitors in the market for healthcare services. (App'x 306-10). Deposition testimony of the Board members established that no

legitimate health and safety rationale supported the decision through wildly inconsistent justifications for the decision and a lack of knowledge of the education, training, certification, and competency of doctors of chiropractic. (App'x 154).

The district court granted summary judgment December 1, 2014 on the grounds that the Board was entitled to judgment as a matter of law on all counts. (App'x 614). It held that Dr. Petrie did not establish concerted action, establish anticompetitive effects, did not meet her burden of disproving the proffered procompetitive benefits, and did not suffer antitrust injury. The court first determined that the rule of reason "presumptively applies and is generally preferred," (App'x 620), despite this Court's decision that the quick-look analysis applies in cases of horizontal exclusionary conduct by quasi-public licensing boards dominated by a decisive coalition of private market participants. *See N. Carolina State Bd. of Dental Exam'rs v. FTC*, 717 F.3d 359, 375 (4th Cir. 2013).

Applying the rule of reason, the district court found that Dr. Petrie had not shown evidence of anticompetitive effects in the

form of "evidence that pricing in the market was altered or that other chiropractors failed to join, or left, the market as a result of the Board's actions." (App'x 622). It did not address Dr. Petrie's arguments that anticompetitive effects could be presumed by the exclusion of an entire class of competitors through a boycott enforceable as a matter of law and through its quasi-precedential chilling effect. (*See* App'x 157–59).

The district court placed the burden on Dr. Petrie—rather than the Board—to show how anticompetitive effects outweigh the general idea of healthcare-professional regulation. (App'x 621–22 ("Plaintiff has . . . [not shown] how the procompetitive benefits of the Board's actions do not justify the potential anticompetitive effects."). The court did not analyze whether the Board's decision to exclude doctors of chiropractic from the relevant service markets had any procompetitive benefits. It instead adopted the Board's assertion that "a state medical board's authority to monitor and regulate the practice of medicine, and sanction practitioners when necessary, is a market benefit not only for consumers, but for the many practitioners who are willing to stay

13

within the scope of practice created by the Virginia General Assembly." (App'x 622–23). Notably, it did not address what that scope of practice is and simply accepted the assertion of the Board. (App'x 622–23).

The district court also ruled that Dr. Petrie did not have standing because she could not show antitrust injury: "By not showing any anticompetitive effects [Dr. Petrie] has failed to show an injury to competition and has merely pointed to her own injury as a competitor." (App'x 624).

Dr. Petrie's direct evidence of conspiracy in the form of the Board's public, official action, along with circumstantial evidence showing that each defendant actively participated in the agreement, was "insufficient evidence from which to infer an anticompetitive conspiracy" to the district court (App'x 624–25). Rather than apply this Court's holding in *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278 (2012) that a board's official action constitutes sufficient direct evidence of concerted action, it held that each of the defendants acted individually in their decision to vote in favor of Petri's sanction. (App'x 624).

## Discovery and Evidentiary Rulings

The district court issued three rulings prior to summary judgment that hampered the prosecution of Dr. Petrie's case and contributed to the district court's final order granting judgment to the Board.

The Board did not make Dr. Barbara Matusiak, the medical review coordinator for the board, available for deposition until the second-to-last day of discovery. In that deposition, Matusiak revealed for the first time that due process worksheets existed for each investigation against Dr. Petrie, despite multiple discovery requests, that the Board had withheld. Matusiak testified she could not answer questions without the worksheets. Matusiak's deposition was continued until after the Board produced the worksheets, at which time she stated several questions regarding the worksheets could only be answered by former Board member Dr. Valerie Hoffman. Dr. Petrie moved to compel Hoffman's deposition, which the district court denied. (App'x 134).

The district court also granted the Board's motion in limine to exclude two of Dr. Petrie's experts, Dr. Dave Edelberg, MD, and

15

Dr. Stephanie Chaney, DC. (App'x 135). Dr. Edelberg and Dr. Chaney would have testified as to the training, education, and scope of chiropractic, the competitive impact of integrative and functional medicine coexisting with traditional, allopathic medicine, the training and credentials of Dr. Petrie, and evidence-based science disputing the Board members' supposed justifications for their decision. (App'x 196–201, 484–499). Notably, these experts would have shown disputes of fact regarding the scope of chiropractic, the anticompetitive effects of the Board's action, and the lack of procompetitive benefits that the district court held Dr. Petrie could not show on summary judgment. *See* Op. 6–12 (App'x 621–24).

The district court also excluded the affidavit of Dr. Petrie's economic expert, Dr. Alexander Volokh, which declared that the Board had mischaracterized his testimony in its motion for summary judgment. (JA 613; DE 154). The Board used Dr. Volokh's testimony to state that he endorsed a view that market power could be inferred from market shares, when "reality is close to the opposite." DE 140-1 at ¶¶ 9–10. Dr. Volokh declared that

the Board's assertion that his testimony conflicted with his expert report was incorrect. DE 140-1 at ¶¶ 5–6. He also stated that the Board claimed his answers to narrow questions supported conclusions they did not and that it incorrectly summarized his testimony. DE 140-1 at ¶¶ 12–15.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*, "viewing the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996); *see* Fed. R. Civ. P. 56. This Court must reverse a grant of summary judgment where the district court erred in finding no genuine issue of material fact or misapplied the law. *See Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002) (holding dispute of fact precluded summary judgment); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 380 (4th Cir. 2013) (stating summary judgment may only be granted where moving party is entitled to judgment as a matter of law).

17

A district court's decision to exclude evidence is reviewed for abuse of discretion. *United States v. Francisco*, 35 F.3d 116, 118 (4th Cir. 1994). A district court's denial or granting of a motion to compel discovery is also reviewed for abuse of discretion. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 929 (4th Cir. 1995).

## SUMMARY OF ARGUMENT

This Court should reverse the district court's order granting summary judgment because (1) genuine disputes of material fact remain as to the issues for which summary judgment was granted, and (2) the district court erred in determining the Board was entitled to judgment as a matter of law.

**Argument 1.** This Court should reverse the district court's order granting summary judgment to the Board because a genuine dispute of material fact remained:

a. The Board did not meet its burden of production showing that no genuine dispute of material fact remained.

18

a. The Board baldly asserted—without pointing to materials in the record—that Dr. Petrie could not prove her claim.

b. The Board failed to address the material allegations of Dr. Petrie's complaint.

b. Dr. Petrie submitted sufficient evidence from the record establishing a genuine dispute of material fact as to each element of her claim.

**Argument 2.** This Court should reverse the district court's order granting summary judgment to the Board because it was not entitled to judgment as a matter of law:

a. Summary judgment was improper because the district court employed the wrong mode of analysis. Quick-look review is the appropriate analysis in this case because it involves a horizontal group boycott by a professional board where the anticompetitive effects—the exclusion of a class of competitors—require no detailed analysis.

b.  Summary judgment was improper because Dr. Petrie made a sufficient showing of anticompetitive effects under either quick-look review or the full rule of reason.

  i.  The Board's order excluded a class of competitors from competing in service markets in which that class of competitors has reduced costs and improved consumer outcomes.

  ii.  The Board's order excluded that class of competitors throughout the Commonwealth of Virginia as a matter of law.

c.  Summary judgment was improper because the Board failed to meet its heavy burden of justifying its conduct by showing that procompetitive benefits outweigh the anticompetitive effects.

  i.  The Board failed to meet this burden by attempting to justify the exclusion of chiropractors from the relevant service markets with the promompetitive benefits of occupational licensing generally.

20

ii. The district court misapplied the law when it held that Dr. Petrie had the burden to show how the anticompetitive effects outweighed the proffered procompetitive benefits.

d. Summary judgment was improper because Dr. Petrie made a sufficient showing of concerted action under this Court's precedent.

i. Dr. Petrie submitted direct evidence in the form of the Board's official, published order excluding her from competing and indirect evidence in the form of deposition testimony showing each Board member actively participated in the decision.

ii. Dr. Petrie submitted evidence warranting an inference that the Board members' purpose in excluding Dr. Petrie from competition was unlawful and not based on any legitimate health, welfare, and safety objective.

e. Summary judgment was improper because Dr. Petrie made a sufficient showing of antitrust injury.

**Argument 3.** This Court should reverse the district court's discovery and evidentiary orders contributing to the final order:

a.  The district court improperly denied Dr. Petrie's motion to compel the deposition of former Board member Valerie Hoffman based on new evidence improperly withheld by the Board until the day before the close of discovery.

b.  The district court improperly excluded the testimony of two of Dr. Petrie's expert witnesses whose opinions bear directly on the anticompetitive effects and lack of procompetitive benefits that the district court held Dr. Petrie could not show.

c.  The district court improperly excluded the affidavit of Dr. Petrie's economist expert declaring that the Board mischaracterized his deposition testimony in its motion for summary judgment.

## ARGUMENT

This Court should reverse the grant of summary judgment below for two reasons: First, the district court improperly granted

summary judgment where a genuine dispute of material fact remained. Second, Dr. Petrie submitted sufficient evidence of concerted activity, anticompetitive effects, and antitrust injury to preclude summary judgment on her Section 1 Sherman Act claim. This Court should also reverse the district court's exclusions of Dr. Petrie's expert's reports and its denial of Dr. Petrie's motion to compel the deposition of former Board member Valerie Hoffman.

## I. THE BOARD DID NOT MEET ITS BURDEN OF SHOWING THE ABSENCE OF A GENUINE DISPUTE OF MATERIAL FACT

The Board was not entitled to summary judgment because genuine disputes of fact remained as to every material element of Dr. Petrie's claims. The Board failed to show the district court that the record established an absence of a material factual dispute. Even though the Board did not carry its burden of production, Dr. Petrie came forward with sufficient evidence to preclude the entry of summary judgment. Accordingly, the district court erred in granting summary judgment for the Board.

Summary judgment may be granted only upon a showing that no material fact is genuinely disputed and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it would affect the outcome of the litigation. [cite]. A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party "always bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has met its burden of showing no dispute of fact remains for trial, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. Where the nonmoving party

carries the burden of proof at trial, she is entitled "to have the credibility of [her] evidence as forecast assumed, [her] version of all that is in dispute accepted, all internal conflicts in it resolved favorably to [her], the most favorable of possible alternative inferences from it drawn on [her] behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered." *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).

The Board thus had the burden of " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also Pulliam Inv. Co*, 810 F.2d at 1286. The Board could have done this by either (1) producing evidence negating an essential element of Dr. Petrie's claim or (2) showing that she does not have enough evidence of an essential element to carry her burden of persuasion at trial.

The Board baldly asserted, without any citation to the record, that Dr. Petrie "failed to establish the basic elements of an antitrust violation." (App'x 85). Its statement of undisputed facts

did not address any element of an antitrust cause of action, nor did it address any of the material allegations contained within Dr. Petrie's complaint. (*See* App. 87–91). The Board did not point to *any* evidence in the record showing that Dr. Petrie could not prevail at trial; it made no assertions regarding the evidence of any specific allegation in Dr. Petrie's complaint, (*see, e.g.*, App. 32–38 at ¶ 99–114); and on rebuttal, it simply disputed the evidence that Dr. Petrie pointed to in her opposition. (App'x 536).

Viewed through the lens of summary judgment, Dr. Petrie pointed to evidence showing that:

- The Board has market power and the power to exclude competitors throughout the Commonwealth of Virginia (App'x 153, 305–315)

- The individual defendants compete with Dr. Petrie in the relevant service markets (primary care services, among others) (App'x 153, 315–19)

- The Board used Dr. Petrie as a springboard to eliminate an entire class of competitors by its own fiat and for improper purposes (App'x 153–54)

- But for the Board's anticompetitive conduct, Dr. Petrie and other doctors of chiropractic would compete or have the potential to compete with the Board's members (App'x 154, 196–201, 306–19, 484–96)

- Doctors of chiropractic in the Commonwealth of Virginia must be certified by the National Board of Chiropractic Examiners to obtain licensure, the exam for which requires a full competency to provide primary care services (App'x 154, 196–201, 484–96)

- Doctors of chiropractic in states whose licenses are not subject to oversight by competing providers encompasses primary care services and has been shown to improve the quality of care, reduce prices, and reduce hospital stays (App'x 154, 491)

- The Board members' post hoc justifications for their exclusionary conduct show ambivalence and a lack of knowledge regarding the scope, training, certification, and practice of chiropractic, casting significant doubt on any legitimate purpose or procompetitive benefits

claimed by the Board in its affirmative defenses (App'x 154)

This Court has held that summary judgment is improper where the parties dispute the plausibility of procompetitive benefits, *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 514 (4th Cir. 2002), where motive and intent play a role, *Morrison v. Nissan Co.*, 601 F.2d 139, 147 (4th Cir. 1979), and where it is not clear that no dispute of fact exists concerning either the facts or the inferences to be drawn from them, *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). The Board's burden was to show that no genuine dispute of fact remained for trial, and it did not do so. Accordingly, this Court should reverse.

## II.   THE BOARD IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

The Board's conduct excluding doctors of chiropractic from multiple healthcare service markets is an unreasonable restraint of trade whether analyzed under quick-look review or the full rule of reason. The district court departed from this Court's precedent

in holding that the Board's conduct should be judged under the rule of reason. A horizontal group boycott against a class of service providers by a professional licensing board controlled by a decisive coalition of a class of competing professionals is analyzed under quick-look review because the anticompetitive effects are not difficult to ascertain. Even under the full rule of reason, however, Dr. Petrie has made a sufficient showing of anticompetitive effects to preclude summary judgment.

## A. Quick-Look Review is the Appropriate Test for the Board's Exclusion of an Entire Class of Competitors

Three analyses are used to determine the reasonableness of a restraint of trade: "(1) *per se* analysis, for obviously anticompetitive restraints, (2) quick-look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508–09 (4th Cir. 2002). The rule of reason is reserved for "testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction, such as an

employment contract or the sale of a going business." *Nat'l Society of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688–89 (1978). *Per se* analysis is applied to conduct "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Id.* at 692. In between these extremes are "quick-look" cases, where "no elaborate industry analysis is required to demonstrate the anticompetitive character" of the conduct because "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 769-70 (1999) (quoting *Nat'l Society of Prof'l Eng'rs*, 435 U.S. at 692).

While this Court has held that the rule of reason applies in the context of conduct concerning a public service aspect of professional associations, *see Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 290 (applying the rule of reason to the rules of a multiple listing service because it is a joint venture that promises more effective and efficient competition) (citing *Am. Needle*, 130 S.Ct. at 2207), it has also made clear that it is "not

30

inclined to condone anticompetitive conduct upon an incantation of 'good medical practice.' " *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 375 (4th Cir. 2013) (quoting *Clinical Psychologists v. Blue Shield of Va.*, 624 F.2d 476, 485 (4th Cir. 1980)). Only those "public service aspect[s]" of a profession might "require that a particular practice . . . be treated differently." *See id.* (quoting *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788 n.17 (1975)).

In *North Carolina State Board of Dental Examiners*, this Court applied the quick-look analysis to horizontal group boycotts designed to force lower-cost providers out of the market because "[i]t is not difficult to understand that [this conduct] has a tendency to increase a consumer's price for that service." *See id.* at 374. That case concerned attempts by a state regulatory board comprising dentists in private practice to coerce non-dentists to refrain from competing in the market for teeth-whitening services. *See id.* at 364–66. The FTC found that the board had engaged in a group boycott in violation of Section 1 of the Sherman Act under both quick-look review and the full rule of reason. *Id.* at 374. The

31

FTC concluded that the conduct was " 'inherently suspect,' because '[it] is, at its core, concerted action excluding a lower-cost and popular group of competitors." *Id.* This Court affirmed the FTC's mode of analysis, stating that the exclusionary practices at issue "are amenable to the quick look approach" because "it is not difficult to understand that forcing low-cost teeth-whitening providers from the market has a tendency to increase a consumer's price for that service." *Id.*

This case likewise involves a concerted effort by a group of private market participants to exclude "a lower-cost and popular group of competitors." *See id.* The Virginia Board of Medicine, like the board of dental examiners, comprises a group of private market participants—medical doctors. Those doctors, through the Board, sought to exclude doctors of chiropractic from, *inter alia*, the market for medical primary care services. Like the non-dentist teeth-whitening providers of that case, Dr. Petrie and other doctors of chiropractic represent a lower-cost and increasingly popular group of competitors. Unlike the dental board, however, the Board did not merely threaten legal action against

32

competitors; it instead *took* legal action to exclude doctors of chiropractic from the market for primary care services by deciding as a matter of law that those services are the practice of medicine and outside the scope of practice of chiropractic.

Despite these similarities, the district court did not address whether quick-look review should apply, instead creating a false dichotomy in which the only modes of analysis were *per se* or full rule-of-reason treatment. (App'x 619–622). It found the rule of reason appropriate because of a "general reluctance to employ the per se unreasonable analysis when dealing with a professional association." (App'x 621). This "general reluctance," however, is not the analysis employed by controlling authority. In affirming the application of quick-look review to the dental board in *North Carolina State Board of Dental Examiners*, this Court noted that the U.S. Supreme Court has applied *per se* and quick-look treatment to the actions of professional associations. *See N. Carolina State Bd. of Dental Exam'rs*, 717 F.3d at 375 (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 437–51 (1982); *Indiana Fed'n of Dentists*, 476 U.S. at 459–60).

33

The nature of the restraint, not the restrainer, determines the mode of analysis. In *National Society of Professional Engineers*, the Supreme Court applied an abbreviated rule of reason to a trade association's ethics rules prohibiting its engineer-members from engaging in competitive bidding because it concerned "[e]thical norms [that] serve to regulate and promote . . . competition." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 696 (1978). The Court expressly rejected "a broad exemption under the Rule of Reason for learned professions." *Id.*; *see also Weiss v. York Hosp.*, 745 F.2d 786, 821 (3d Cir. 1984) (explaining that the "learned professions" rule is inapplicable where no "public service or ethical norm" rationale has been offered). In *Indiana Federation of Dentists*, the Court refused to give *per se* treatment to a professional association that sought to force particular terms on insurers through a vertical restraint that the Court declined to "forc[e] the Federation's policy into the 'boycott' pigeonhole." This Court has noted that attempts by professional associations to limit competition by eliminating "a representative of a class is being excluded from the market" is

34

different than the elimination of a single competitor through ethics, competence, or quality control standards. *See Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (noting difference between eliminating representatives of competing classes of healthcare providers and revoking privileges of a doctor on competence and conduct grounds in analyzing anticompetitive harm). The Board did the former when it saw its exclusion of Dr. Petrie as "an opportunity to draw a bright line between . . . the scope of practice for medicine and the scope of practice for chiropractic to the benefit of all our chiropractic licensees, all other licensees[6], the public, the attorneys, the media etcetera." (App'x 472–73 (169:22–170:6)).

The rule of reason is, at bottom, "an inquiry into market power and market structure designed to assess [a restraint's] actual effect." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984). This elaborate inquiry is not necessary here, where the nature of the restraint and the Board's power to exclude is established as a matter of law rather than by a plenary market analysis. *Cf. Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d

499, 509 (4th Cir. 2002) (stating that sometimes a "plenary market examination" is required to determine whether the defendant played a significant role in the market, thus implicating Section 1). Because the Board's power to exclude is undisputed, [cite to record!], and the effect of its conduct is easily ascertained, this Court should apply quick-look review to its conduct.

### B. Dr. Petrie Made a Sufficient Showing of Anticompetitive Effects Under Quick-Look Review and the Full of Reason

Regardless of whether this Court applies quick-look or rule-of-reason treatment to the Board's conduct, Dr. Petrie has made a sufficient showing of anticompetitive effects to preclude summary judgment. The district court held, without discussion of the evidence submitted, that Dr. Petrie could not show anticompetitive effects. It accepted the Board's proffered procompetitive justifications that its general authority to regulate the scope of practice of various classes of healthcare professional licensees and sanction them was a market benefit justifying its conduct. But the Board and the district court did not consider any

procompetitive benefits of the conduct challenged by Dr. Petrie's complaint: that the exclusion of doctors of chiropractic from the relevant service markets, as competitors of medical doctors who as a class dominate the Board, was a horizontal group boycott that harmed competition.

This Court should reverse the district court's grant of summary judgment because the Board's conduct has clear anticompetitive effects. Even if this Court applies the rule of reason, Dr. Petrie has made a sufficient showing of anticompetitive effects to preclude summary judgment. Furthermore, the Board failed to meet its "heavy burden" of justifying as procompetitive the exclusion of doctors of chiropractic from the relevant service markets by focusing instead on the benefits of practices that are not the subject of Dr. Petrie's complaint.

The rule-of-reason analysis is aimed at determining whether the restraint at issue harms or promotes competition. In applying the rule of reason, the "factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be

prohibited as imposing an unreasonable restraint on competition," taking into account " 'specific information about the relevant business' and 'the restraint's history, nature, and effect.' " *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) (quoting *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36 (1977); *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997). The "purpose of the analysis is to form a judgment about the competitive significance of the restraint, . . . not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of an industry." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978).

The rule of reason requires a plaintiff to "prove what market . . . was restrained and that the defendants played a significant role in the relevant market." *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002). While "facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, . . . as well as the availability of reasonable, less restrictive alternatives" should be considered, *Id.*, "the special characteristics of a particular industry" cannot

overcome Congress's consistently reaffirmed national policy in favor of competition. *See Nat'l Soc. of Prof'l Eng'rs*, 435 U.S. at 689.

The purpose of analyzing market power and structure is to "assess [a restraint's] actual effect." *Leegin Creative*, 551 U.S. at 885-86 (2007). A "detailed inquiry into a firm's market power is [thus] not essential when the anticompetitive effects of its practices are obvious," such as when "a representative of a class of competitors has been excluded from the market." *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (citing *FTC v. Superior Court Trial Lawyers Ass'n.,* 493 U.S. 411 (1990); *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440 (9th Cir. 1988); *Cooper v. Forsyth Cnty. Hosp. Auth., Inc.*, 789 F.2d 278 (4th Cir. 1986); *Weiss v. York Hosp.*, 745 F.2d 786, 821 (3d Cir. 1984)). Once the plaintiff meets her burden, the court must take a hard look at [any procompetitive] justification to determine if it meets the defendant's burden of coming forward with—but not establishing—a valid efficiency justification." *Cal. Dental*, 526 U.S. at 780 n.15.

### 1. Dr. Petrie made a sufficient showing of market power and anticompetitive effects

Dr. Petrie offered substantial evidence that Board had market power (*i.e.*, the power to exclude competitors) throughout the Commonwealth of Virginia and that they in fact exercised this power anticompetitively by excluding a representative of a class of competitors.

Dr. Petrie's expert economist, Dr. Alexander Volokh, defined the relevant geographic markets as the entire Commonwealth of Virginia due to the Board's power to exclude or include healthcare service providers as a matter of law. (App'x 310). Volokh established the relevant service markets as the set of services the Board asserted were outside the scope of chiropractic in its order: the treatment and diagnosis of various metabolic diseases; the diagnosis or treatment of "any human physical or mental ailments, conditions, diseases, impairments or infirmities by any means or method," administering or prescribing vitamins or supplements, and the use of a low-level nonsurgical laser. (App'x 311–12).

Volokh established that while the Board's exclusion of Dr. Petrie from the relevant service markets caused harm to her in her particular market, it also "harmed competition throughout the state of Virginia" and in each of the Board members' markets "by exerting an exclusionary effect on doctors of chiropractic who are similarly situated to plaintiff." (App'x 311). Even absent a formal precedential effect, which the Board has not disputed, the Board's conduct has anticompetitive effects because "a rational observer would conclude that the Board would proceed identically against any other practitioner similarly situated to plaintiff, to the extent that the practitioner's characteristics were similar to plaintiff." (App'x 310).

The Board did not submit any evidence to show that competition is alive and well in the market for primary care services despite its exclusion of chiropractors. But even if it had, the Supreme Court has made clear that a "conspiracy [is] 'not to be tolerated merely because the victim is just one merchant' " and that injury to the competitive process can be inferred from the

nature of a horizontal group boycott. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134 (1998) (quoting [Klor's, 359 U.S. xxx, 213]).

Dr. Petrie established that doctors of chiropractic throughout the nation desire to compete in the market for primary care services and actually do. She also showed the potential of doctors of chiropractic to benefit competition *and* patient outcomes by competing in the market for primary care services. The district court, however, did not discuss or consider this evidence in its opinion, instead adopting the Board's assertion that Dr. Petrie had not made a showing.

2. *The Board failed to meet its burden of showing that procompetitive benefits outweigh the anticompetitive effects*

The Board had the burden to "come forward with" procompetitive benefits to justify the restraint. But the Board did not proffer any justification for the exclusion of doctors of chiropractic from the market for primary care services (or the other relevant service markets); it instead attempted to justify its exclusion by touting the health and safety benefits of licensing regimes and scope of practice restrictions generally. (App'x 97–98).

42

Dr. Petrie has not alleged that the Commonwealth's statutory scheme of licensure and scope of practice violates the Sherman Act; indeed, she embraced the differences in the various scopes of practice in her complaint. (App'x 12 at ¶ 33 ("This also creates an important distinction when there is overlap in scope, such as treating a diabetic. It is the method of treatment . . . that differentiates doctors of chiropractic from medical doctors, podiatrists, and doctors of osteopathy.")). The crux of Dr. Petrie's complaint is that the Board's decision was *contrary* to Virginia law, that it constituted a "power grab" by "[m]edical doctors and doctors of osteopathy who have financial incentives to limit the scope of practice of competitors like chiropractors." (App'x 16–19). Dr. Petrie alleged, and later substantiated, that she was (1) trained, qualified, and certified by an accreditation authority to provide the services she was excluded from, (2) that she was required to obtain certification to provide those services in order to obtain licensure as a doctor of chiropractic in the Commonwealth, (3) that the individual Board members' decisions were financially motivated, (4) that they had no legitimate health and safety

justifications for excluding properly certified doctors of chiropractic from the relevant service markets, and (5) the Board made its decision without legal justification or state backing (App'x 22 at ¶ 72). She also presented evidence that the Board's decision regarding the scope of chiropractic is contrary to the national consensus of healthcare regulatory boards. (App'x 196-201).

Even under the rule of reason, the Board has a "heavy burden" of justifying its restraint with procompetitive benefits. *See Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 113 (1984) (holding defendant has burden to justify deviation from policy in favor of competition). The district court was to take a "hard look" at the anticompetitive effects and procompetitive justifications to "determine the competitive significance of the restraint," and not to reassess whether Congress's "policy favoring competition is in the public interest." *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978). Congress has decided that "ultimately competition will produce not only lower prices, but also better goods and services,"

*Id.* at 695, and competition in healthcare proves no different. (App'x 491–92 (showing results of seven-year study of chiropractic primary care in Illinois)). It was incumbent upon the Board to show why chiropractors are not competent to compete in the relevant service markets where Dr. Petrie has shown that they are trained, tested, and certified to do so, that they in fact do so throughout the United States, and that they do so at a lower cost and with better patient outcomes.

## C. The Board's Official, Published Action Against Dr. Petrie is Sufficient Evidence of Conspiracy

The district court erred in holding that Dr. Petrie had not shown that the Board's members engaged in concerted action where Dr. Petrie submitted direct and indirect evidence of conspiracy. The Board's official, published action and the Board members' testimony that they actively participated in the decision sufficiently establish concerted action for the purposes of summary judgment.

Section 1 of the Sherman Act applies only to concerted action, thus requiring "evidence of a relationship between at least two

legally distinct persons or entities." *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 284 (4th Cir. 2012) (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991)). Mere contacts and communications or the opportunity to conspire are not enough to establish a conspiracy. *See Cooper v. Forsyth Cnty. Hosp. Auth., Inc.*, 789 F.2d 278, 281 (4th Cir. 1986). Where the concerted conduct requires an inference, a plaintiff must submit evidence that tends "to exclude the possibility of independent action." *Robertson*, 679 F.3d at 289. Where the plaintiff's case rests upon a public resolution by a professional organization, however, that action is direct evidence establishing "that the defendants convened and came to an agreement." *Id.* In other words, direct evidence in the form of official, public action by the board of a professional organization establishes concerted activity under Section 1. *See id.*; *N. Carolina State Bd. of Dental Exam'rs*, 717 F.3d at 373.

In *North Carolina State Board of Dental Examiners*, this Court found sufficient the FTC's direct evidence that the licensing board "discussed teeth whitening services provided by non-dentists and

46

then voted to take action to restrict those services." *Id.* Like the dental-board defendant in that case, the Board did not dispute that it took action against Dr. Petrie or its members' involvement in the decision. It simply argued that Dr. Petrie submitted no evidence that disproved the possibility of parallel or independent conduct. (App'x 94).

Dr. Petrie submitted evidence in the form of the Board members' depositions establishing that each was an active participant and a proponent of excluding Dr. Petrie from the relevant service markets. (App'x 161, 236, 255, 472–73). The Board's own official, public order establishes that the members convened and ultimately decided to take concerted action against her. (App'x 437). The Board's executive director went so far as to admit the decision was an attempt to "draw a bright line between . . . the scope of practice for medicine and the scope of practice for chiropractic." (App'x 473 (170:1–4)). She also submitted significant deposition testimony by the Board's members casting doubt on the Board's arguments that it was engaged in legitimate health and safety regulation; the Board

members' ambivalence toward the statutory scheme, the chiropractic accreditation and licensing process, and inconsistent reasoning establishes that the Board concealed its anticompetitive conduct behind a false façade of the public interest. (App'x 146–153, 222–227, 229, 289–91).

This Court has held that questions of fact surrounding a conspiracy to restrain trade should preclude a grant of summary judgment. In *Neel v. Waldrop*, 639 F.2d 1080 (4th Cir. 1981), this Court held that summary judgment was precluded where an inference of conspiracy could be drawn from the parallel refusal of a defendant bank. Likewise, in an action by a credit-card-loss notification service against another such service, its board chairman and vice-president for a conspiracy to injure another in trade or business, issues of material fact remained on the question whether the board chairman and vice-president conspired with the other service, precluding summary judgment. *Safecard Servs., Inc. v. Dow Jones & Co.*, 537 F.Supp. 1137 (D. Va. 1982), *affirmed without opinion*, 705 F.2d 445 (4th Cir. 1983), *certiorari denied* 104 S.Ct., 464 U.S. 831, 78 L.Ed.2d 111.

Dr. Petrie sufficiently established concerted activity and the Board offered no evidence to the contrary. Notably, the Board's members submitted no affidavits or other evidence negating the reasonable inference of unlawful purpose that must be drawn in Dr. Petrie's favor. The district court erred by failing to view this evidence and draw all reasonable inferences in the light most favorable to Dr. Petrie as the nonmoving party. *See Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

## D. Dr. Petrie Made a Sufficient Showing of Antitrust Injury

The district court correctly noted that "a plaintiff must have antitrust standing, which is created by suffering an injury 'of the type the antitrust laws were intended to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 477-78 (1977).'" Op. at 9 (App'x ). The *Brunswick* Court clarified that antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Id.* "The injury should reflect the anticompetitive effect . . . of the violation." *Id.*

The Board committed anticompetitive acts by excluding chiropractors from being primary care providers. This exclusion occurred at the same time that chiropractors were almost universally accepted as primary care providers throughout the United States, and recognized by insurance carriers elsewhere as being more efficient than medical doctors. (App'x 38–40 at ¶¶ 115–119).

Plaintiff has alleged adequate antitrust damages here. She is not a well-healed competitor, as in *Brunswick*, but a competitor with medical doctors for primary care services. This case is more analogous to *Pinhas v. Summit Health, Ltd.*, 500 U.S. 322 (1991), where the plaintiff offered the market an innovation that promised lower costs or improved outcomes, and he could prove that the cause of his dismissal was the defendants' wish not to compete with such innovations. In *Pihas*, the plaintiff alleged that his staff privileges to perform ophthalmological surgery were revoked because he had developed techniques that permitted surgery to be done by one physician rather than two, thus saving costs.

In *Pinhas*, the Supreme Court observed that

"[t]he competitive significance of respondent's exclusion from the market must be measured, not just by a particularized evaluation of his own practice, but rather, by a general evaluation of the impact of the restraint on other participants and potential participants in the market from which he has been excluded." 500 U.S. at 332.

The *Pinhas* Court also noted that the "proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful." *Id*. at 330.

The Board's acts here have sent a strong message to chiropractors in Virginia that they should not consider competing with medical doctors to become primary care providers. The Board's aggressive acts toward Dr. Petrie have served to chill other chiropractors in Virginia from even assisting in her case. Indeed, the Board has taken every chance to prohibit chiropractors from providing general testing services to truck drivers through Department of Transportation exams, as other chiropractors do throughout the United States (App'x 22–23 at ¶ 72; 36 at ¶ 112). Thus, it appears that the potential harm on competition is great from the Board's anticompetitive acts taken towards Plaintiff and other chiropractors.

51

Indeed, the Board's Order against Dr. Petrie was meant to keep other chiropractors from providing primary care services. She alleged and substantiated that chiropractors have been offering primary care services in many other markets, that they compete with medical doctors for patients, and have enhanced competition by reducing costs of services and medicine.[5] (App'x 20–23 at ¶¶ 60–73; 26–27 at ¶¶ 83–86; 154; 310–12; 491).

A fair review of the actual disputed issues of fact in this case reveals that numerous issues of material fact exist as to the issue of antitrust standing and antitrust injury. Although the district court held that Dr. Petrie failed to show antitrust injury, Op. 8 (App'x 623), her first amended complaint and her disputed issues of fact identified in opposition to summary judgment are replete with examples of antitrust injury in this case. (App'x 1–49, 149–155).

---

5 In the First Amended Complaint, Plaintiff points to "a pivotal seven (7) year study in Illinois has shown, however, that the ability of chiropractors to practice as CPCPs results in a marked reduction in hospital admissions, hospital stays, out-patient surgeries and related procedures and costs of prescription medications compared to when reliance is placed exclusively on conventional PCPs." FAC ¶ 87.

Chiropractors are a competitive threat to medical doctors, and the Board's own statistics show that it has taken disciplinary action against chiropractors far more frequently than in proportion to doctors of medicine and osteopathy in Virginia who appear to be in favor with the Board. (App'x 25–26). In fact, the Board's own statistics support the fact that the Board and its members are biased against chiropractors, which is consistent with the financial incentive medical doctors and other competitors of chiropractors have to limit the scope of chiropractic. (App'x 26 at ¶ 82). Dr. Petrie also alleged that "[l]imiting the scope of chiropractic limits the overlap of services that chiropractors and medical doctors provide to the same set of patients." *Id*. The Board did not address this allegation in its motion for summary judgment.

Most of the disputed issues of fact identified by Dr. Petrie involved antitrust injury, and injury to competition. (App'x 152–56), The Board and its members have market power to exclude competition throughout Virginia, and the members themselves "compete with Dr. Petrie in the relevant service markets." (App'x

53

153). "The decision to exclude Dr. Petrie as a competitor was not based on any law or regulation or health and safety concern, but rather on her competitors' desire to limit a class of competitors by making an example of her." (App'x 153). "But for Defendants' anticompetitive conduct, Dr. Petrie and other doctors of chiropractic would compete with or have the potential to compete with Defendants in the relevant service markets." (App'x 154).

"Dr. Petrie was trained to provide, and was certified by the Council on Chiropractic Education ("CCE") to provide," all aspects of primary care services, and these were the same services for which she was sanctioned by the Defendants. (App'x 154). "Plaintiff's claims are based upon actions undertaken by the Defendants before, during, and after Dr. Petrie's formal hearing, including the decision to exclude doctors of chiropractic from the market for DOT physical exams, taking actions to undermine her relationships with patients (past, present and future), insurance providers and diagnostic laboratories." (App'x 154).

Doctors of chiropractic outside of Virginia "compete with allopathic healthcare providers in the relevant service markets

and would also compete in the Commonwealth of Virginia but for the Defendants' anticompetitive, exclusionary conduct." (App'x 154–55). "The broader scope of practice of chiropractic in states whose chiropractic licensees are not subject to oversight by a decisive coalition of competing allopathic providers has been shown to improve the quality of care, reduce prices, and reduce hospital stays." (App'x 155). "Chiropractors are capable of providing primary care services and nutrition advice." (App'x 155). "Defendants' lack of knowledge and ambivalence regarding the scope, training, certification, and practice of chiropractic negate any health and safety rationale for their exclusionary conduct as unsupported, post hoc justifications." (App'x 155–56).

Based upon the numerous disputed facts at issue here, Dr. Petrie has demonstrated antitrust injury. Conspiracies, market allocation, and market manipulation, such as precluding chiropractors from being primary care providers, are all the types of injuries the antitrust laws were intended to prevent. The Board has taken many affirmative actions against Plaintiff and other chiropractors that protect medical doctors from the competition of

55

chiropractors. These actions by the Board caused the types of injuries that the antitrust laws were meant to protect. Therefore, the district court's decision on antitrust injury was incorrect and should be reversed.

### III. THE DISTRICT COURT IMPROPERLY PREVENTED THE DISCOVERY AND PRESENTATION OF EVIDENCE

#### A. The District Court Improperly Denied Dr. Petrie's Motion to Compel Deposition of Valerie Hoffman

The district court erred by not granting Dr. Petrie's motion to compel the deposition of Dr. Valerie Hoffman, DC. (Doc. 125). The Board did not make Dr. Barbara Matusiak, MD[6] available for a deposition until September 11, 2014, the next to the last day of the discovery period. In her deposition, Dr. Matusiak revealed to Dr. Petrie for the first time that the Board had due process worksheets for each investigation of Dr. Petrie that had not been produced by the Board after multiple requests from Dr. Petrie

---

6. Dr. Mikulski's is employed by the Board and her official title is Medical Review Coordinator. She is the gatekeeper for due process for the Board once it receives investigations from the Department of Health Professions.

(before filing suit), after multiple discovery requests (after filing suit) and despite more than one successful motion to compel in the district court.

Dr. Matusiak testified that she could not answer questions about her due process review of the Board's investigations of Dr. Petrie without looking at the due process worksheets. Dr. Petrie again specifically requested these due process worksheets during Dr. Matusiak's deposition. The Board's counsel produced them the following day—September 12—the last day of discovery, with one of the worksheets missing a crucial portion.

A second deposition of Dr. Matusiak took place on September 24, 2014 (12 days after discovery was supposed to close), and during this second day of Dr. Matuziak's deposition several questions were raised that only Dr. Valerie Hoffman could answer.[7] Dr. Matusiak could not provide any information on why

---

7. For example, Dr. Matusiak testified that she could not adequately interpret all of the notes on the due process worksheets, as many of the notes were made by Dr. Hoffman, *see* Exhibit 2, (Vol. II, p. 141, ll. 8-14). Also, Dr. Matusiak revealed, for the first time, that the initial investigation involving Dr. Petrie had probably been closed solely by Dr. Hoffman (Exhibit 2, Vol. II, p. 144, ll. 2-7). Dr. Hoffman was a doctor of chiropractic who was a

the closed investigation was later voided, after further review by Dr. Hoffman and the Board's Executive Director Dr. William Harp. After reading the transcript from the second deposition of Matusiak on September 30, 2014, it became apparent for the first time that only Hoffman could answer some of the questions about the Board's due process worksheets.

The Board opposed the taking of Dr. Hoffman's deposition by claiming that Dr. Petrie had known about Dr. Hoffman's role since the beginning of this case and that she should have sifted through millions of pages of documents to find these worksheets earlier in the discovery period. Dkt 122 at 3. Defendants also argued that it was too late in the case to permit the deposition, even though Plaintiff made it clear how important this issue was to her case.

The Board referred to "the three worksheets that were the subject of the Board's action against the plaintiff" (Dkt. 122 at 4) just as they had represented that there were three investigations in their motion for summary judgment. However, throughout

_____

Board member, and who had sat on Dr. Petrie's informal hearing panel in April 2012. This initial investigation appears to have been re-opened by a competing medical doctor, Dr Harp.

discovery, the Board and all of the Individual Defendants stated that the Board had considered four investigations of Dr. Petrie. The Board has not explained the disappearance of one of its investigations[8], and this creates a clear disputed fact that should have precluded a finding of summary judgment.

## B. The District Court Improperly Excluded Dr. Petrie's Expert Reports

The court below erred by granting the Board's Motion in Limine to Exclude the Expert Testimony of David Edelberg, MD and Stephanie J. Chaney, DC. Dkt 72. In its opinion, the court correctly stated the test for the admission of expert evidence when it stated:

"Evidence is relevant if it has any tendency to make any fact consequential to the outcome more or less probable." Fed. R. Evid. 401. "The threshold for relevancy is relatively low." *United States*

---

8.   The most obvious reason is that the investigation had been closed by Dr. Hoffman because the conduct at issue was actually within the scope of chiropractic. Dr. Matusiak could not decipher all of Dr. Hoffman's notes, including at least one line of handwriting that ran off the page. The scope of chiropractic was a significant issue in this case, and cited in the Board's order as justification to suspend Appellant for six months and assess her a fine of $25,000.00.

*v. Powers*, 59 F.3d 1460, 1465 (4th Cir. 1995). To satisfy the relevance standard, "evidence need only be 'worth consideration by the jury,' or have a 'plus value.'" *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997)). Expert testimony, however, "which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. There must be a "valid . . . connection between the expert's testimony and the pertinent inquiry before the court as a precondition to admissibility." *Garlinger v. Hardee's Food Sys., Inc.*, 16 F. App'x 232, 235 (4th Cir. 2001)." Dkt 130 at 5–6.

### a. Dr. Edelberg

Dr. Edelberg has been a medical doctor since 1968 and has been managing partner of Whole Health Chicago, an "integrative medical practice" that combines both conventional and alternative healing approaches. *See* (App'x 495). He has extensive experience as a practicing medical doctor who has employed M.D.s, D.O.s, and D.C.s as primary care providers. *Id.* For over two decades Dr. Edelberg has studied and written about integrative healthcare and the tension between the medical establishment and

healthcare providers. *Id.* As a result, Dr. Edelberg has extensive knowledge regarding the history of restraints of trade in U.S. healthcare markets and of the education, training, and scope of practice of both medical and chiropractic doctors. His testimony would focus on the history of medical restraints of trade, competition between medical doctors and doctors of chiropractic, the market injury that results from restraints of trade in healthcare markets, the scope of medicine and chiropractic, and the function of a primary care provider. All of these subjects are directly relevant to Plaintiff's claims.[9]

Dr. Edelberg's report "focuses on the historical relationship between conventional medicine and nonconventional medicine, such as chiropractic," and he gave his opinion regarding Dr. Petrie's sanction that "[n]o chiropractor can expect fair judgment in atmosphere (sic) where she's being reviewed not by peers but by her competition." (App'x 489). Despite the above criteria identified

---

9. Deposition testimony of the Individual Defendants actually underscored the importance of expert testimony on these matters. *See, e.g.*, Clements Dep. 36:11–37:5, Aug. 21, 2014 (defining scope of chiropractic based on feelings as a practitioner and board member rather than state law).

by the court below, it held that Dr. Edelberg's testimony "does not assist the trier of fact." (App'x 147). The court further stated that Dr. Edelberg's testimony "does not provide any assistance in determining whether Defendants have violated (sic) 5 U.S.C. § 1," "does not speak to the nature of the restraint (sic) not help establish the standard of reasonable and would not assist in either the per se unreasonable analysis nor the Rule of Reason analysis." (App'x 146–47).

### b. Dr. Chaney

Dr. Stephanie Chaney, D.C., has been practicing chiropractic for over a decade and serves on the Maryland Board of Chiropractic Examiners as a board member and past president. Chaney Bio. at 1 (Ex. 4). Her direct, relevant experience in the training, licensure, professional standards, and scope of practice of doctors of chiropractic indisputably qualifies her as an expert. In her report, Dr. Chaney provides a rich comparison of medical doctors to doctors of chiropractic, an overview of national testing and accreditation requirements, board regulation, and the abilities of doctors of chiropractic to diagnose and treat diseases

that the Board asserted was beyond the scope of Dr. Petrie's license.

Defendants criticized Dr. Chaney for not being licensed to practice chiropractic in Virginia, and that her report is not Virginia-specific. However, this is a federal antitrust action in which Plaintiff asserts that the Defendants unlawfully restrained trade under the guise of a scope of practice regulation. Indeed, several Defendants have admitted that they make scope of practice determinations based on something other than Virginia law.[10]

The court held that "Dr. Chaney's testimony is similarly unhelpful in this inquiry. Her testimony regarding the general scope of chiropractic throughout the United States would not help

_____

10. *See, e.g.*, Clements Dep. 36:11–37:5, Aug. 21, 2014 ("Chiropractors would not be considered primary care providers because of the scope of what is needed to manage someone's medical needs." He further states that his position is not based on any law or regulation but "what me as a board member feels is necessary to properly manage someone."); Dunnavant Dep. 84:9–86:14, July 6, 2014 (stating that ordering labs is outside the scope of chiropractic because of opinion that chiropractors "don't usually order labs and interpret them.").

resolve the issue of whether the restraint was reasonable." (App'x 146–47).

### c. The Edelberg and Chaney Reports are Highly Relevant to This Case

The Board's criticism that Dr. Petrie's experts are not licensed in Virginia or offer legal opinions on the scope of chiropractic under Virginia law, and the court's decision following this reasoning, all misunderstand the nature of this antitrust lawsuit and the issues of relevant markets. While the legal scope of chiropractic in Virginia is a relevant issue in this case, it is merely one of many. This is not a case that merely seeks a review of the Board's determination under Virginia law.

Instead, Dr. Petrie seeks to prove that, regardless of the content of Virginia law on the question, the Individual Defendants utilized the Board to collectively restrain trade by excluding doctors of chiropractic in Virginia (including Dr. Petrie) from competing with medical doctors, podiatrists, and osteopaths in one or more relevant service markets. To answer that initial question, the fact-finder must determine whether doctors of chiropractic

indeed compete for some groups of patients with the medical professionals on the Board. While Defendants vigorously deny any such competition, both Dr. Chaney and Dr. Edelberg can assist the fact-finder in making that determination because they both have relevant experience and expertise that allows them to educate the jury on the patient overlap between doctors of chiropractic and other medical professionals. This type of practical experience is absolutely necessary for a jury to understand whether certain health professionals actually do compete in any relevant service market.

Dr. Edelberg, for example, explains based upon his knowledge and experience that alternative approaches to medicine—often practiced by doctors of chiropractic—are, indeed, in the real world, offering patients an alternative to the medical doctors that dominate the Board. This is helpful to the fact-finder's determination whether there is any such direct competition. He also explains that doctors of chiropractic (including Dr. Petrie) can compete with the relevant medical professionals as primary-care providers, which is the very market that Defendants' economist

defines as relevant in this case. In addition to his actual experience and knowledge, Dr. Edelberg cites a groundbreaking study that demonstrates that chiropractors actually out-performed medical doctors as primary-care providers.

Dr. Chaney, as a doctor of chiropractic herself and as a regulator of doctors of chiropractic in another state, can testify to the training and testing that doctors of chiropractic must satisfy in all states, including Virginia. This includes training in the areas that the Defendants' restrain competition.

The reports and testimony of Dr. Edelberg and Dr. Chaney are clearly relevant to Plaintiff's antitrust claims, and relate to several important issues that Dr. Petrie must prove at trial. Many of the medical and chiropractic issues, including competition and primary care medical services are somewhat complicated, and the testimony of Edelberg and Chaney will assist the jury with its consideration of the relevant factors in this case. This Court should reverse the district court's order and remand with instructions that the, expert testimony of David Edelberg, MD and Stephanie J. Chaney, DC be admitted for trial.

## C. The District Court Improperly Struck Dr. Petrie's Expert's Declaration

In its memorandum supporting their motion for summary judgment, the Board mischaracterized the deposition testimony of Dr. Volokh on at least two occasions. First, the Board referenced deposition testimony of Dr. Volokh to support its argument that "the five individual defendants who voted to sanction the plaintiff during her formal disciplinary hearing at the Board were independent centers of decision making." Doc. 118 at 10.

In her opposition to Defendants' motion for summary judgment, Dr. Petrie made it clear that "Defendants misunderstand or mischaracterize the law as well as Dr. Volokh's deposition testimony on these points." (App'x 160 n.22). In addition, she noted that "Defendants also mischaracterize Dr. Volokh's report and testimony. Market shares are not dispositive here because Dr. Petrie makes a direct showing of market power (the Board's jurisdiction and power to exclude) and actual anticompetitive effects (the exclusion of competitors). (App'x 162).

Dr. Petrie submitted the Declaration of Dr. Volokh (Dkt 140-1) to address the Defendants' misinterpretations of Dr. Volokh's deposition testimony. In his declaration, Dr. Volokh addressed some of Defendants mischaracterizations in his own words. In paragraphs 5 and 6 of his declaration, Dr. Volokh explained how there was no conflict between his deposition testimony and his expert report. Dkt 140-1 at ¶¶ 5 – 6.

Dr. Volokh noted that on page 12 of defendants' summary judgment motion, "Defendants imply that I have endorsed inferring market power from market shares, and further imply that I have not adduced evidence of actual anticompetitive effects." Dkt 140-1 at ¶¶ 7 – 8. Dr. Volokh went on to explain why "the reality is close to the opposite" of Defendants' mischaracterization of his testimony. Dkt 140-1 at ¶¶ 9 – 10.

Finally, Dr. Volokh addressed testimony attributed to him on page 13 of defendants' summary judgment motion. Dkt 140-1 at ¶ 11. Dr. Volokh clarified that defendants had asked him narrow questions at his deposition that did not address the points they claimed, that defendants did not ask follow-up questions which

would have been necessary to reach their conclusions, and that they were incorrect in summarizing his testimony. Dkt 140-1 at ¶¶ 12 – 15.

Defendants' burden under Fed. R. Civ. P. 56 is to demonstrate that there are no genuine issue of material fact, and the Defendants have badly mischaracterized the expert testimony of Plaintiff's expert. The declaration of Plaintiff's expert should be permitted to counter Defendants' mischaracterizations and to show the court that some of Defendants' representations about the Plaintiff's expert are indeed disputed issues of material fact. The court should employ a five-factor test for the exclusion of evidence under Rules 26 and 37:

> "In exercising [its] discretion [to exclude evidence under Rule 26 and 37], a district court is guided by the following factors: (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony."

*Rambus, Inc. v. Infineon Technologies AG*, 145 F. Supp. 2d 721, 726 (E.D. Va. 2001).

Applied to Dr. Volokh's declaration, exclusion is not warranted. First, Defendants can claim no surprise as the declaration merely corrects their mischaracterizations and because the declaration contains no new tests, evidence, or conclusions. Second, Defendants may submit in response their own declaration to cure any surprise they claim. Third, because the declaration is offered for the discrete purpose of correcting misrepresentations of Defendants—in a situation where cross examination is not available—it will have no effect upon trial. Fourth, Plaintiff only submitted the declaration as a result of Defendants' mischaracterizations—which were only brought to light upon Defendants' filing for summary judgment. Finally, Dr. Volokh's declaration is important because cross examination is not available on summary judgment.

The declaration of Dr. Volokh highlighted several disputed issues of fact and mischaracterizations of the record by Defendants. These disputed issues, and all reasonable inferences from them, should have been viewed by the court below in the light most favorable to the nonmoving party when it granted

Defendants' motion for summary judgment. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). Thus, the court below erred by striking the declaration of Dr. Volokh, and Dr. Volokh's declaration should have been considered in determining the outcome of Defendants' motion for summary judgment.

## CONCLUSION

The district court granted summary judgment to the Board where material facts were genuinely disputed and where the Board failed to meet its burden of production in supporting its motion for summary judgment. The court also erred in improperly determining that the Board was entitled to judgment as a matter of law. It also erred in three evidentiary decisions that contributed to its final judgment. Accordingly, this Court should reverse the district court's grant of summary judgment so that Dr. Petrie may proceed to prove her claims at trial.

## STATEMENT OF RELATED CASES

Appellant is aware of no related cases pending in this Court.

## STATEMENT REGARING ORAL ARGUMENT

Dr. Petrie requests that this Court hold oral argument in this case because the outcome will clarify the standard of analysis for antitrust violations by professional associations in the Fourth Circuit and because this case involves legal issues of significant public interest.

Local Rule 36(a) provides that opinions of the Fourth Circuit will be published "only in cases that have been fully briefed and presented at oral argument." A decision warrants publication when it has value as a statement modifying or clarifying a rule of law within the Fourth Circuit or where it concerns a legal issue of significant and ongoing public interest.

This Court's decision will clarify the applicable standard of analysis for claims concerning horizontal group boycotts by professional associations. This Court's decision also concerns an issue that is now at the forefront of state and federal policy

72

debates: restraints set by self-interested professional licensing boards designed to entrench incumbent competitors.

Respectively submitted and dated:  February 17, 2015

s/ Vincent M. Amberly
Vincent M. Amberly
AMBERLY LAW
129 Harrison Street N.E.
Leesburg, VA  20176
vinceamberly@yahoo.com


Aaron R. Gott
GOTT PLLC
1660 South Highway 100
Suite 500
St. Louis Park, MN  55416
aaron.gott@mac.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 13,304 words, as indicated by Microsoft Word 2013, in accordance with Fed. R. App. P. 32(a)(7) and Local Rule 32(b).

Dated: February 17, 2015

<div style="margin-left: 50%;">

s/ Vincent M. Amberly
Vincent M. Amberly
AMBERLY LAW
129 Harrison Street N.E.
Leesburg, VA  20176
vinceamberly@yahoo.com


Aaron R. Gott
GOTT PLLC
1660 South Highway 100
Suite 500
St. Louis Park, MN  55416
aaron.gott@mac.com

</div>

# ADDENDUM

## 15 U.S.C. § 1

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

## 15 U.S.C. § 4

The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1 to 7 of this title; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises.

## 15 U.S.C. § 15

(a) Amount of recovery; prejudgment interest

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the

defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such person promptly made, simple interest on actual damages for the period beginning on the date of service of such person's pleading setting forth a claim under the antitrust laws and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances. . . .

\*     \*     \*

(c) Definitions

For purposes of this section--

(1) the term "commercial activity" shall have the meaning given it in section 1603(d) of Title 28, and

(2) the term "foreign state" shall have the meaning given it in section 1603(a) of Title 28.

## 15 U.S.C. § 26

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14,18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit for injunctive relief against any common carrier subject to the jurisdiction of the Surface

Transportation Board under subtitle IV of Title 49. In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to such plaintiff.

## 28 U.S.C. § 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

## 28 U.S.C. § 1331

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1337(a)

The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies: *Provided, however*, That the district courts shall have original jurisdiction of an action brought under section 11706 or 14706 of title 49, only if the matter in controversy for each receipt or bill of lading exceeds $10,000, exclusive of interest and costs.

## Va. Code § 54.1-2900

As used in this chapter, unless the context requires a different meaning:

"Acupuncturist" means individuals approved by the Board to practice acupuncture. This is limited to "licensed acupuncturist" which means an individual other than a doctor of medicine, osteopathy, chiropractic or podiatry who has successfully completed the requirements for licensure established by the Board (approved titles are limited to: Licensed Acupuncturist, Lic.Ac., and L.Ac.).

"Auricular acupuncture" means the subcutaneous insertion of sterile, disposable acupuncture needles in predetermined, bilateral locations in the outer ear when used exclusively and specifically in the context of a chemical dependency treatment program.

"Board" means the Board of Medicine.

"Genetic counselor" means a person licensed by the Board to engage in the practice of genetic counseling.

"Healing arts" means the arts and sciences dealing with the prevention, diagnosis, treatment and cure or alleviation of human physical or mental ailments, conditions, diseases, pain or infirmities.

"Medical malpractice judgment" means any final order of any court entering judgment against a licensee of the Board that arises out of any tort action or breach of contract action for personal injuries or wrongful death, based on health care or professional services rendered, or that should have been rendered, by a health care provider, to a patient.

"Medical malpractice settlement" means any written agreement and release entered into by or on behalf of a licensee of the Board in response to a written claim for money damages that arises out of any personal injuries or wrongful death, based on health care or professional services rendered, or that should have been rendered, by a health care provider, to a patient.

"Nurse practitioner" means an advanced practice registered nurse who is jointly licensed by the Boards of Medicine and Nursing pursuant to § 54.1-2957.

"Occupational therapy assistant" means an individual who has met the requirements of the Board for licensure and who works under the supervision of a licensed occupational therapist to assist in the practice of occupational therapy.

"Patient care team" means a multidisciplinary team of health care providers actively functioning as a unit with the management and leadership of one or more patient care team physicians for the purpose of providing and delivering health care to a patient or group of patients.

"Patient care team physician" means a physician who is actively licensed to practice medicine in the Commonwealth, who regularly practices medicine in the Commonwealth, and who provides management and leadership in the care of patients as part of a patient care team.

"Physician assistant" means an individual who has met the requirements of the Board for licensure and who works under the supervision of a licensed doctor of medicine, osteopathy, or podiatry.

"Practice of acupuncture" means the stimulation of certain points on or near the surface of the body by the insertion of needles to prevent or modify the perception of pain or to normalize physiological functions, including pain control, for the treatment of certain ailments or conditions of the body and includes the techniques of electroacupuncture, cupping and moxibustion. The practice of acupuncture does not include the use of physical therapy, chiropractic, or osteopathic manipulative techniques; the use or prescribing of any drugs, medications, serums or vaccines; or the procedure of auricular acupuncture as exempted in § 54.1-2901 when used in the context of a chemical dependency treatment program for patients eligible for federal, state or local

public funds by an employee of the program who is trained and approved by the National Acupuncture Detoxification Association or an equivalent certifying body.

"Practice of athletic training" means the prevention, recognition, evaluation, and treatment of injuries or conditions related to athletic or recreational activity that requires physical skill and utilizes strength, power, endurance, speed, flexibility, range of motion or agility or a substantially similar injury or condition resulting from occupational activity immediately upon the onset of such injury or condition; and subsequent treatment and rehabilitation of such injuries or conditions under the direction of the patient's physician or under the direction of any doctor of medicine, osteopathy, chiropractic, podiatry, or dentistry, while using heat, light, sound, cold, electricity, exercise or mechanical or other devices.

"Practice of behavior analysis" means the design, implementation, and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior, including the use of direct observation, measurement, and functional analysis of the relationship between environment and behavior.

"Practice of chiropractic" means the adjustment of the 24 movable vertebrae of the spinal column, and assisting nature for the purpose of normalizing the transmission of nerve energy, but does not include the use of surgery, obstetrics, osteopathy or the administration or prescribing of any drugs, medicines, serums or vaccines.

"Practice of genetic counseling" means (i) obtaining and evaluating individual and family medical histories to assess the risk of genetic medical conditions and diseases in a patient, his offspring, and other family members; (ii) discussing the features, history, diagnosis, environmental factors, and risk management of genetic medical conditions and diseases; (iii) ordering genetic laboratory tests and other diagnostic studies necessary for genetic

assessment; (iv) integrating the results with personal and family medical history to assess and communicate risk factors for genetic medical conditions and diseases; (v) evaluating the patient's and family's responses to the medical condition or risk of recurrence and providing client-centered counseling and anticipatory guidance; (vi) identifying and utilizing community resources that provide medical, educational, financial, and psychosocial support and advocacy; and (vii) providing written documentation of medical, genetic, and counseling information for families and health care professionals.

"Practice of medicine or osteopathic medicine" means the prevention, diagnosis and treatment of human physical or mental ailments, conditions, diseases, pain or infirmities by any means or method.

"Practice of occupational therapy" means the therapeutic use of occupations for habilitation and rehabilitation to enhance physical health, mental health, and cognitive functioning and includes the evaluation, analysis, assessment, and delivery of education and training in basic and instrumental activities of daily living; the design, fabrication, and application of orthoses (splints); the design, selection, and use of adaptive equipment and assistive technologies; therapeutic activities to enhance functional performance; vocational evaluation and training; and consultation concerning the adaptation of physical, sensory, and social environments.

"Practice of podiatry" means the prevention, diagnosis, treatment, and cure or alleviation of physical conditions, diseases, pain, or infirmities of the human foot and ankle, including the medical, mechanical and surgical treatment of the ailments of the human foot and ankle, but does not include amputation of the foot proximal to the transmetatarsal level through the metatarsal shafts. Amputations proximal to the metatarsal-phalangeal joints may only be performed in a hospital or ambulatory surgery facility accredited by an organization listed in § 54.1-2939. The practice includes the diagnosis and treatment of lower extremity ulcers;

however, the treatment of severe lower extremity ulcers proximal to the foot and ankle may only be performed by appropriately trained, credentialed podiatrists in an approved hospital or ambulatory surgery center at which the podiatrist has privileges, as described in § 54.1-2939. The Board of Medicine shall determine whether a specific type of treatment of the foot and ankle is within the scope of practice of podiatry.

"Practice of radiologic technology" means the application of x-rays to human beings for diagnostic or therapeutic purposes.

"Practice of respiratory care" means the (i) administration of pharmacological, diagnostic, and therapeutic agents related to respiratory care procedures necessary to implement a treatment, disease prevention, pulmonary rehabilitative, or diagnostic regimen prescribed by a practitioner of medicine or osteopathic medicine; (ii) transcription and implementation of the written or verbal orders of a practitioner of medicine or osteopathic medicine pertaining to the practice of respiratory care; (iii) observation and monitoring of signs and symptoms, general behavior, general physical response to respiratory care treatment and diagnostic testing, including determination of whether such signs, symptoms, reactions, behavior or general physical response exhibit abnormal characteristics; and (iv) implementation of respiratory care procedures, based on observed abnormalities, or appropriate reporting, referral, respiratory care protocols or changes in treatment pursuant to the written or verbal orders by a licensed practitioner of medicine or osteopathic medicine or the initiation of emergency procedures, pursuant to the Board's regulations or as otherwise authorized by law. The practice of respiratory care may be performed in any clinic, hospital, skilled nursing facility, private dwelling or other place deemed appropriate by the Board in accordance with the written or verbal order of a practitioner of medicine or osteopathic medicine, and shall be performed under qualified medical direction.

"Qualified medical direction" means, in the context of the practice of respiratory care, having readily accessible to the respiratory

care practitioner a licensed practitioner of medicine or osteopathic medicine who has specialty training or experience in the management of acute and chronic respiratory disorders and who is responsible for the quality, safety, and appropriateness of the respiratory services provided by the respiratory care practitioner.

"Radiologic technologist" means an individual, other than a licensed doctor of medicine, osteopathy, podiatry, or chiropractic, or a dentist licensed pursuant to Chapter 27 (§ 54.1-2700 et seq.), who (i) performs, may be called upon to perform, or who is licensed to perform a comprehensive scope of diagnostic radiologic procedures employing equipment which emits ionizing radiation and (ii) is delegated or exercises responsibility for the operation of radiation-generating equipment, the shielding of patient and staff from unnecessary radiation, the appropriate exposure of radiographs or other procedures which contribute to any significant extent to the site or dosage of ionizing radiation to which a patient is exposed.

"Radiologic technologist, limited" means an individual, other than a licensed radiologic technologist, dental hygienist or person who is otherwise authorized by the Board of Dentistry under Chapter 27 (§ 54.1-2700 et seq.) and the regulations pursuant thereto, who performs diagnostic radiographic procedures employing equipment which emits ionizing radiation which is limited to specific areas of the human body.

"Radiologist assistant" means an individual who has met the requirements of the Board for licensure as an advanced-level radiologic technologist and who, under the direct supervision of a licensed doctor of medicine or osteopathy specializing in the field of radiology, is authorized to (i) assess and evaluate the physiological and psychological responsiveness of patients undergoing radiologic procedures; (ii) evaluate image quality, make initial observations, and communicate observations to the supervising radiologist; (iii) administer contrast media or other medications prescribed by the supervising radiologist; and (iv) perform, or assist the supervising radiologist to perform, any other

procedure consistent with the guidelines adopted by the American College of Radiology, the American Society of Radiologic Technologists, and the American Registry of Radiologic Technologists.

"Respiratory care" means the practice of the allied health profession responsible for the direct and indirect services, including inhalation therapy and respiratory therapy, in the treatment, management, diagnostic testing, control and care of patients with deficiencies and abnormalities associated with the cardiopulmonary system under qualified medical direction.

## Fed. R. Civ. P. 56. Summary Judgment.

(a) Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion. . . .

(c) Procedures.

(1) *Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or

dispute a fact cannot be presented in a form that would be admissible in evidence.

(3) *Materials Not Cited*. The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations*. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated. . . .

(e) Failing to Properly Support or Address a Fact. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or

(4) issue any other appropriate order.

## Fed. R. Evid. 401

Evidence is relevant if:
(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25, I hereby certify that I electronically filed this brief with the Clerk of Court for the United States Court of Appeals for the Fourth Circuit by using the Appellate CM/ECF system on February 17, 2015. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Appellate CM/ECF system.

Dated: February 17, 2015

<u>s/ Vincent M. Amberly</u>
Vincent M. Amberly
AMBERLY LAW
129 Harrison Street N.E.
Leesburg, VA  20176
<u>vinceamberly@yahoo.com</u>


Aaron R. Gott
GOTT PLLC
1660 South Highway 100
Suite 500
St. Louis Park, MN  55416
<u>aaron.gott@mac.com</u>